to Elizabeth Tyree v. Anthony Fox. Good morning, your honors. May it please the court. I'm James Shaw, here representing the Plaintiff Appellant Elizabeth Tyree. This case presents the question, I think primarily, of whether an employer under McDonnell-Douglas burden shifting can satisfy its burden to articulate a legitimate non-discriminatory reason without offering any testimonial evidence. In support of its proffered reason. In other words, what does it mean to articulate a legitimate non-discriminatory reason in this context? So I think it's clear that the first stage belongs to the plaintiff. She has to establish a prima facie case. For the purposes of this argument, that's not in dispute. So the burden then shifts to the employer to articulate its reason. It's our position that in order to articulate that reason, somebody from the employer has to testify in some form or another as to what the reason was. We're at the summary judgment stage, so the testimony will be maybe deposition in the form of an affidavit, answers to interrogatories, something along the lines. What is unusual about the record in this summary judgment employment case is that there is no testimony at all from anyone on the employer's side. And so when the employer stakes out a position in its brief to this court that the reason Ms. Tyree wasn't able to move along with the CRADA, the Cooperative Research and Development Agreement, was because she walked away, that is a statement by counsel. It has never been said by anyone at the employer. But there is a request to admit that was admitted by your client as to the sequence of events, and those show the edited SOW going from Wang to your client, and then your client never responding. That's what the admitted to. So isn't that what they're pointing to is that she did an SOW, Wang has vetted it as McBride said would be necessary, sends it back to your client. She didn't like it because of the edits, and then instead of getting back to Wang or doing something, she then went and asked that Wang be removed. Did she ask that Wang be removed? She asked that one person, the contact person be changed. She asked that Dr. Wang not be the contact person in order to coordinate that project. So that's correct. And by then she was making a claim with the EEO officer. She was making a claim to the EEO officer. So if we look back at the chronology that's agreed, what is the discriminatory act here? Is it his editing of the SOW? The discriminatory act is that the employer never followed through on the CRADA, that Ms. Tyree alleges that the employer stopped the process and it never followed through on what it had promised. But she's admitted that she never got back to Wang. How could she say that the employer stopped the process? Well, because immediately after the email from Dr. Wang, she went and did raise a complaint with the EEO office in an attempt, in her own words, to further along the process. The reason she was seeking to work with someone other than Dr. Wang was because she believed he was the source of the discriminatory animus. And so she wanted to work with someone else. So they turned down a request to change Wang. And the employer at that point completely dropped. Well, the ball was still in her court. She still didn't get back to Wang. Well, I understand the sequence that you're pointing to. But the idea that the employer just sends an email and doesn't get a reply to it, where the employee is undertaking extraordinary efforts through the EEO office and so forth in order to get the CRADA moving along, begs the question, why didn't someone else step in and make a response, follow up with her? The idea that that is a definitive moment, a non-response to an email, that she definitively has walked away from the process, I don't think is the only... I can understand why that conclusion might be available, but that is certainly not the only conclusion that's there. And when on summary judgment, all inferences have to be taken in the favor of the non-moving party. The fact that the inference is possible that you're describing doesn't mean that the court should drive that inference where there's other inferences available. So you're saying then the discriminatory act is that after she asked to remove Wang and they didn't, Wang should have reached out to her again and said, are you going to get back to me? The employer should have, whether it was from Dr. Wang, from someone. I wouldn't want to pinpoint it to anyone. That's an adverse employment action for them not to have repeated the request that she respond to Wang's... No, the adverse employment action is that she didn't get this CRADA. The mechanism that occurred is that they didn't, is that the employer dropped out of those, out of that process, as Ms. Tyree views it. But isn't it clear she didn't get the CRADA because the process stopped? It just died. Well, it's clear she didn't get the CRADA because the process didn't continue. Right. I don't know that I agree with that. So then we need to look at why the process didn't. And that's what I keep coming back to. It seems your client essentially admitted that the reason the process stopped was she never got back. She never admitted that. Well, she did admit that she didn't respond to the email. Right. But to jump to the conclusion that that means that's why the process stopped, I don't think is the only inference one can draw from those facts. We don't know, for example, what Dr. Wang was thinking or Dr. Geyer or Ms. McBride, other managerial folks in this agency who were involved directly in this CRADA statement of work process, why they didn't continue. Well, did they continue for discriminatory reasons is the question. And what evidence do you have of that? Well, I think it goes back that without knowing what their state of legitimate reason was, there's nothing to rebut. You know, the stages of burden shifting are that when the employer does proffer that evidence and gives its reason, then the employee, you know, it's her turn to then provide evidence of pretext. But where the employer hasn't offered that second stage evidence to begin with, and instead it's only the inferential chain that Your Honor is pointing to. And by the way, that wasn't pointed to in the district court as the reason. It was merely a fact among the contextual background factors. So at the district court level, there was no assertion at all of a legitimate, non-discriminatory reason. But didn't they say the process died? It stopped. There's a reference late in the brief, but there's no framing that that's the issue. I mean, I think that it's important that at the district court level, the McDonnell-Douglas framework is used. And, in fact, the Supreme Court has said that because the purpose is to narrow the focus, sharpen the inquiry. So I don't think it's enough for an employer to come to the district court and say, we didn't discriminate and here's a whole lot of facts about the case that seem to show that we didn't discriminate, without saying here's why the thing she's complaining about happened. That's, in our view, not enough. We also don't think that it's a reasonable inference to jump to the conclusion that not responding to an email is the end-all, be-all. And so, for example, this isn't not responding to an email. This is the formal feedback that is given on the SOW, which McBride has explained from the beginning. It's the vetting of that that's a crucial part of it. And she's very unhappy when she gets it and doesn't get back at all to provide any feedback on it, to say she wouldn't even type in changes to it. I think our difference is that the suggestion in your question is that because she didn't reply to that email, that that's the end of it. That is the conclusion. The conclusion has to be that she dropped out. Well, nothing else happened other than she went off and complained to the EEO officer. Well, I don't think that's an insignificant factor, I guess. So she goes off and complains to the EEO officer. What appears to have happened, although, again, no one from the employer has said this, is that the employer jumped to a conclusion. This is my inference, I suppose, jumped to a conclusion that she's shifted to a different realm, a litigation realm that her employment realm has failed, so now she's going to challenge it as discriminatory. But, in fact, she was believing that that was the process to continue. Moreover, the fact that she, if we take the employer's proper reason to be, she dropped out. The fact that she went to the EEO office, and it's at that point that the employer stops communicating with her beyond the CEO process, that raises an inference of retaliation. Now, I'm not arguing that there's a retaliation claim in the case. But if a jury could conclude that the reason the employer dropped out of the process was for retaliatory reasons, that is in contradiction to the employer's stated reason, that the reason she dropped out was her own fault. And if the jury can believe there was a different reason, the jury can conclude there's discrimination. Where do we even get to the pretext? What evidence of any discrimination at all, even to raise an inference to get to the employer's burden, do we have in this case? Well, pretext is the evidence. But even before the employer offers a reason, it just seemed... Well, she establishes a prima facie case by establishing that she's a member of a protected class, there's an adverse action, and that's essentially the prima facie case. She does that. That's enough to establish an inference of discrimination. The burden shifts to the employer, then, to say, no, no, no. It's for something else, and then the employer has to show pretext. I think the question that the judge was asking, at least, is one I had in my mind. What is the evidence of discrimination here? The evidence of discrimination has to be understood from the ability of the fact finder to find pretext. There is no direct evidence of discrimination. It's not that kind of case. This is a circumstantial evidence case. So I can't point to you to epithets or stereotypes.  I'm sorry? Do you have circumstantial evidence? The circumstantial evidence is that the employer has said she dropped out, and that there is evidence that would allow a jury to say, no, she didn't, because the employee was doing the best she could to get that thing in place because it was so important to her. What right did she have to insist that Wang be replaced? He'd done all this work. He'd been the one assigned in the beginning. He took this on. What right did she have to insist that they replace him with someone else? I mean, normally in a workplace, if someone goes in and says, I want my boss replaced, and the employer says no, and then the employee doesn't communicate with the boss anymore, that's kind of the end. I think an employee has a right to make that request when she believes that the supervisor is acting discriminatorily toward her. How? Again, I would like to know how. She alleged sex discrimination. Sex discrimination as well as race and ethnicity. Well, no, she only raised sex when she went to EEO. I'm not sure that that's true, but she raises discrimination, certainly. She may have expanded on that at some other point. I don't know. The evidence is that she's a – I guess I can't give you more than that. She is – that there is circumstantial evidence that she did something. There is evidence that shows it wasn't she who dropped out. So what right is it of her to ask for a new supervisor? Well, I think it's her right under the statute. Now, the employer, I understand, doesn't have to jump to her attention and exceed to her demands, but certainly she has the right to demand it and the right to continue and to engage further down the line if her request is granted, which is what she did. But take us to that point, the request doesn't get granted. At that point, why doesn't she then just pick up where she left off before the detour to get him removed and respond to him and give some feedback on his – he'd given an SOW to her that had a lot of work in it that had a lot of substantial differences. I'm really having difficulty understanding why she wouldn't get back and say, here are my comments or something like that. There's nothing in the record that answers your question factually. I could speculate about why she didn't. It seems like she deemed that just unacceptable to her because it wouldn't meet her thesis needs, and that was the end. I don't know. I mean, I understand your point. The record is thin, so the summary judgment record does not include a lot of facts beyond the trail of emails between various individuals. So I don't know why she didn't go back. So based on the state of the record, I understand what the argument is. There was a motion to compel which the court denied. Do we have sufficient information from this record? And, I mean, what do you have to say about the denial of that motion to compel? We don't have anything specifically to say about the denial of the motion to compel. It's an electronic order denied without any explanation. I understand, but I don't have anything to offer on that particular point. The record is created throughout the summary judgment process. The thinness of the record started with the employer putting its case forward with no testimony and only predominantly an exchange of emails. That's the employer's record. And Ms. Tyree responded in kind by also pointing to emails. So the record is inherently thin for that reason, and there's some deposition evidence, deposition testimony from Ms. Tyree. Except you don't need any of that evidence at all if you put in under Rule 56 a request to admit and the other party admits a point, then that's in there no matter what evidence is put. I agree, and, yes, we're not disputing that this chain of events occurred as you've described them. There are differences in how that should be interpreted, in that there's more than one inference to draw, and when you can draw more than one inference, you can't take the employer's side as the moving party in a Rule 56 motion. Thank you. Thank you. Ms. Wickers, good morning. Good morning, Your Honor. Your Honors, may it please the Court, Christina Wickers for the Secretary of Transportation. This case is about a graduate student who wanted confidential research data for her master's thesis, and she wanted it from a federal lab that had this confidential research data, and two research scientists tried to help her get access to that data so she could work on her master's thesis through this unusual tool called a CRADA. So she was recruited by them initially to come work for them and do research, and they were her employers as well as part of her academic team? Yes and no, Your Honor. She was recruited. It was a two-year internship through the Federal Career Internship Program, the FCIP program. She knew it could end after two years, and that would be the end, and that is what happened. But she also made clear at the beginning that the research that she intended to get from them was going towards her master's thesis. That is an allegation that she made. And so at the end of the internship, which, again, she knew that that could be the end of it, she said, well, my employment has ended, but has my research ended too because I need it to graduate? And Dr. Geyer and Dr. Wang, who had no obligation to help her get access to this confidential data, tried to help her get access through this CRADA, through this unusual tool. But when the negotiations took too long, in Ms. Tyree's opinion, she abandoned them. She terminated those discussions and accused them of discrimination. Well, she went to a counselor and specifically asked that a different contact person be appointed. That's true. How is that abandonment? Well, she asked for a different contact person from Dr. Wang and $300,000, and the Volpe Center said no. And the fact that they could not replace Dr. Wang with someone else is something she knew from the beginning of the Statement of Work negotiations because Dr. Geyer had told her, look, Dr. Wang was your supervisor for two years. He's the team lead for this whole WAKE program. And you've even listed him as the technical contact at the Volpe Center listed on your master's thesis. He's the person. Now, she didn't like that response, and I understand that. So the problem I have with this record, and certainly it's her problem, is that the record is thin. But if, hypothetically, an employee is the victim of discrimination by a supervisor, what is that person to do except request a different supervisor? Well, one thing that one can do is to file an EEO complaint and keep on working. You keep on working. You can either resign or you can keep on working. If you resign and then you attack your resignation as a result of the discrimination, you have to prove constructive discharge. Very difficult. But people do file a complaint. I'm unhappy about this. I'm going to allege discrimination, but I'm going to keep on keeping on. The problem is this is a hybrid situation because it's not true employment. The benefit she was trying to attain was the research that she had specified that she needed in order to complete her thesis. At least according to her allegation, she couldn't continue to work, as you're suggesting, because she couldn't get access to the data. And at least according to her allegation, the suggestion that Dr. Wang made about the artificial data, as she puts it, it would have been writing a completely new thesis, different and apart from the one that she was actually working on. Well, so two answers to that, Your Honor. I would respectfully disagree with the assertion that she couldn't keep working. By working, I mean she could have said, okay, they turned down my requested solution in the EEO process. I'm going to keep going with that complaint. I'm going to now file an administrative complaint and work through the process. At the same time, I'm going to get back to Dr. Wang and keep these negotiations going up because I want that data. She could have said to herself, I'm so fed up with Dr. Wang. I'm going to keep pursuing my discrimination claim, which she did, and I'm going to choose a different master's thesis topic. It's expensive. It's not like graduate education costs nothing. I don't disagree with you, Your Honor. But, again, these two men were trying to help her. They were not obligated. Not according to her, right? Well, that's her feeling. That's her position. Well, yes, but it's not supported by the evidence. When she finished her employment, and that's- She says the evidence that supports it is what she considers an extraordinary delay in the whole development of the SOW. That's true, but there's no evidence supporting that either. The only thing that we- She got no discovery, so we don't know. No, no, no. She did get discovery, Your Honor. I was trial counsel. I took the only- She got limited discovery. Actually, that's not quite right, Your Honor. She chose not to take any depositions. I took only one deposition, and that was of Ms. Tyree. She served me with four requests for documents and two sets of interrogatories, and she was unhappy with some of my responses and, therefore, filed a motion to compel. Judge Sobel denied that motion. Her order is written. It's available from the district court record. It's not in the joint appendix. So she did take discovery. She was free to take discovery. Ms. Tyree- I mean, I know she was pro se, and I'm not saying that it's not difficult to be a pro se plaintiff in a Title VII case. It is. But she chose not to take any depositions. She did request documents. I gave them to her. She has all the-I produced all of the e-mails, and I produced-she wanted, for example, information on how long does it take to negotiate a CRADA, and we produced the documents showing that the two CRADAs that the Volpe Center had entered into in the last six or seven years took, in one case, six months to complete the statement of work, and in another case, I believe it was over three years, longer than the amount of time it took here before the negotiation stopped. She then wanted CRADA information-statement of, excuse me, statement of work information relating to any contract that the Volpe Center had ever entered into. So not CRADA related, statements of work relating to any type of contract you can think of. And I objected, and I said, no, no, this is a CRADA case, and Judge Lovell agreed. So we did have back and forth. Ms. Tyree is a very intelligent woman. She, you know, she did proceed pro se, but she also litigated this case. She didn't just sit on her hands. So- What do you say that there's missing from your case an affidavit from your client saying, we stopped working on it because she didn't get back to us, or something like that, some statement? It's not-it's simply not required. The argument is novel. This court, or any court as far as I know, has ever held that that is required. Our burden to articulate a lawful reason for the decision is minimal, as this court has said, and it doesn't have to be in an affidavit or a deposition. I mean, think of a situation where- Where does it come from? Well, for example, Your Honor, if somebody got a termination letter and said, you are hereby terminated for poor performance- But that's from an employer. That's a statement of an employer. Yes. Where in this case is there the articulated reason for the discharge from someone? It's in the e-mails. It's apparent from the e-mails. The e-mails show she is the one who-the back and forth, and she's the one who abandoned the negotiations. That's the reason. That's the fact. We've never deviated from that. That's what the evidence has always shown. Again, she could have pursued her discrimination claim and continued to negotiate. She chose not to. That was her choice. So we met that minimal burden, and the e-mails are the supporting evidence, and then she has to come back and show- Now, my brother said all she has to show is the prima facie case. That is not true. It is true that this Court has said in unusual cases, when the prima facie case, combined with evidence just of pretext, is particularly strong. So that, for example, the explanation by the employer is inherently incredible. No way you can believe it. That could be enough from which a jury could say, and we infer the real reason was discrimination. That is not this case. In this case, the evidence of pretext, there isn't any, so you really need both evidence of pretext and evidence of discrimination. And as Judge Torroya pointed out, there isn't any evidence of discrimination. No reasonable jury could find that two research scientists, Dr. Geyer and Dr. Wang, who went out of their way to try to help her after her employment ended. Dr. Geyer is the one who said, how about a CRADA, because Ms. Tyree had never heard about it. It was his suggestion, and he contacted her advisor at WPI, and he e-mailed his boss and said, do you think the head of the Volpe Center would be in favor of this? The documents are right there showing he's trying to promote it, and then the other person, the alleged discriminator is Dr. Wang. He's writing back and forth with her, saying, here's a suggestion, what do you think? She doesn't like the suggestions, and she doesn't want to type them into the SOW. That's not how could any reasonable jury find that those two men discriminated against her, when they're the ones who tried to help her. And the only evidence that she articulated, when I asked her at her deposition evidence of discrimination, was all occurred before Dr. Geyer suggested the CRADA, and we had these negotiations. The first one was a comment made when she was still employed there by some other person, not a decision maker, about why wasn't a man, some male employee at a meeting, and someone said his baby is sick, and someone else supposedly said, where's his wife? The second one was that Dr. Geyer had given her some negative feedback on some work she had done. The third one was that supposedly he had compared her to two male employees who she said had different duties. And the fourth one was that Dr. Geyer supposedly declined to revise a performance evaluation for her, but he had agreed to revise a male colleague's performance evaluation. That's all we got. And after those things happened, her internship ended, and then she says, oh, well, shoot, I've lost my employment, but I've also lost my master's thesis, and Dr. Geyer goes out of his way to try to help her and says, let's see if we can do a CRADA. And then we get Dr. Geyer and Dr. Wang trying to help her, and then it ends because she gets frustrated. No reasonable jury could conclude from that evidence that the real reason that the CRADA didn't happen was her gender or her race or her national origin. That was the basis on which Judge Sobel entered summary judgment. But there are two other bases that we articulated, and of course this court is free to affirm summary judgment on any basis apparent in the record. The second argument is that what she was allegedly denied was an academic benefit, which goes to your argument or your statement, Judge Thompson, and not an employment benefit. And that's what this was. This CRADA was going to be an agreement between her university and the Volpe Center. It wasn't going to be an agreement with her, through which ideally the confidential wake data would have been made accessible to WPI, and she could have access to it to work on her master's thesis. That's an academic benefit. She wouldn't have gotten a salary. She wouldn't have gotten employment benefits. It was simply an educational benefit, not actionable under Title VII. And then the third reason that we've articulated is that the adverse action in this case was simply too speculative. She says, you discriminate against me because the statement of work negotiations ended, and so we didn't have a CRADA. Okay, let's even assume that that was true. Now you have to show that if the statement of work negotiations had continued, a CRADA would have been signed and approved by Ms. McBride, who would have written it, by the director of the Volpe Center, by WPI, and by the director of the RETA, the Research and Innovative Technology Administration in Washington, D.C., part of the Department of Transportation. Next you have to assume, and then we would agree, if the CRADA had happened, she would have had access to that data to do her master's thesis. Next you have to conclude that she would have actually written and completed her master's thesis. Well, but then she would have had a shot at it. She would have had a shot at it. If she could show that McBride and WPI would have signed on to a CRADA, then she would have had something, a CRADA opportunity. She would have had access to the research data, but she still would have to show even after that that she would have completed her thesis and that she would have graduated. And there it's relevant that 10 years later she still hasn't. But at that point now it sounds like you're just arguing the quantum of damages. Not really. It has to be – the harm has to be tangible. It can't be – or not tangible, but it can't be speculative. And we've cited cases in our brief to that point. And here I think there are too many layers of speculation. If you hadn't terminated the Statement of Work Negotiations, I would have had a CRADA. If I had a CRADA, I would have completed my master's thesis. If I completed my master's thesis, I'd have a degree. It's too many layers of speculation. The heart of her claim is the piece about the delay. And you point out that according to your clients, two record CRADA situations that were produced, it took much longer. Her evidence would be the statement from her professor saying it's extraordinary, based on our experience with CRADAs in various institutions, that it doesn't take a month. That it's a few days and it's extraordinary if it takes a month. I don't believe that her advisor said that was his experience with CRADAs. I believe what he said was a statement of work should not take that long. But a statement of work is a precursor to different types of contracts. Right. Which is why she was asking for the different types of contracts. Well, right. But we're talking here about a CRADA. So there is no evidence that a statement of work for a CRADA, that five months was an unusually long period of time. And she was trying to figure out why it was taking so long to get a statement of work proposal, which, according to her advisor, shouldn't take that long. And according to your client, I suppose, it takes as long as it takes. Well, there's no evidence that anyone said a statement of work for a CRADA ought to take less time. Except for her advisor. No, he said a statement of work. Not a statement of work for a CRADA. A statement of work was her question. That's the question posed. That's the question answered. So there is no evidence from which a jury could find that a statement of work should not have taken this length of time. Isn't there an e-mail from McBride at WPI saying the statement of work for the CRADA is going to take a lot of vetting? Yes. Yes, absolutely, Your Honor. She said, look, she kept getting back to Ms. Tyree saying, look, this takes time. You guys got to agree on this. Once I get it, I then have to draft the CRADA. There's going to be vetting. It's a long process. Thank you very much.